WILLIAM DOMNARSKI, State Bar No. 200977
6144 Omega Street
Riverside, CA 92506
Tel. 951-334-0529
FAX 951-369-7233
domnarski@sbcglobal.net

Attorney for
RICHARD ELROY GIDDENS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. ED CR 06-20-VAP |
| Plaintiff, | DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT; SENTENCING MEMORANDUM |
| RICHARD ELROY GIDDENS, | SENTENCING HEARING; |
| Defendant. | DATE: SEPTEMBER 14, 2009 |
| | TIME: 9:00 A.M. |

TO: THE HONORABLE VIRGINIA A. PHILLIPS, U.S.D.J., ASSISTANT UNITED STATES ATTORNEY SHERI PYM, AND TAMI KELLER, UNITED STATES PROBATION OFFICER.

    Defendant RICHARD ELROY GIDDENS ("DEFENDANT"), by and through his counsel of record, William Domnarski, submits the following (1) Objections to the Presentence Investigation Report ("PSR") prepared in the above-captioned matter pursuant to the United States Sentencing Guidelines ("U.S.S.G.") and (2) Sentencing Memorandum.

I. OBJECTIONS TO PSR

A. FACTUAL OBJECTIONS

 DEFENDANT has no factual objections to the PSR.

B. U.S.S.G. CALCULATIONS

 DEFENDANT has no objections to the Criminal History Category or to the U.S.S.G. offense level calculation.

C. DEPARTURES/ADJUSTMENTS

 DEFENDANT argues for no adjustments but does argue for departures based on (1) age and health factors and (2) substantial assistance. Given that in the wake of *Booker* departures are now obsolete, *United States v. Aranout*, 431 F.3d 994, 1003 (9th Cir.2005)(concluding that after *Booker* the guidelines' departure provisions are obsolete), arguments for these departures are subsumed by arguments for a variance and are found below in the Sentencing Memorandum portion of this position paper.

II. SENTENCING MEMORANDUM, 18 U.S.C. §3553(a)

 As our Ninth Circuit recently emphasized, in the wake of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), federal sentencing is now governed by 18 U.S.C. §3553(a). *United States v. Menyweather*, 431 F.3d 692, 696 (9th Cir.2005). The United States Supreme Court in *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2546. 168 L.Ed.2d 203 (2007), has now made clear that the U.S.S.G. enjoy no presumption of reasonableness at the district court level. At the appellate level perhaps, but not at the trial level. As Justice Breyer put it, "the sentencing court subjects the defendant's sentence to

the thorough adversarial testing contemplated by federal sentencing procedure. *Id.* At 2465.  "In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* Citing *Booker*. *See Nelson v. United States*, 555 U.S. ___, 129 S. Ct. 890, 892, 172 L.Ed.2d. 719 (2009)("Our cases do not allow a sentencing court to presume that a sentence within the applicable range is reasonable.")and *United States v. Carty*, 520 F.3d 984 (9th Cir.2008), for our Ninth Circuit's *en banc* embrace of this position.   The 18 U.S.C. §3553(a) factors, it has been recognized, are of a"vague and nondirectional" character, *United States v. Gammicchia*, 498 F.3d. 467,469-70 (7th Cir.2007)(Posner, J.).

    We know in the wake of *Booker* that the range of choice dictated by the facts of the case has been significantly broadened. *Gall v. United States*, 552 U.S. ___, 128 S.Ct. 586, 602, 169 L.Ed.2d 445 (2007)(finding a sentence outside the Guidelines to be reasonable).  In fashioning a *Booker* sentence, courts can vary from Guidelines ranges based solely on policy considerations, including disagreements with the guidelines, *Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007), or because the Guidelines sentence fails to properly reflect §3553(a) considerations, *Rita* at 127 S.Ct. 2456, 2465. In addition, factors that have already been taken into account in calculating the advisory guideline range, such as a defendant's lack of criminal history, can nevertheless form the basis of a variance. *United States v. Chase*, 560 F.3d 828, 830-31 (8th Cir.2009). And with regard to that 3553(a) analysis, it

is clear that the sentencing court is free to exercise its discretion and that in considering the issue as a variance factor the standards used for departures do not apply.  As the Seventh Circuit recently put the matter, while the guidelines in variance considerations can still be used for guidance.  *United States v. Powell*, ___ F.3d ___, 2009 WL 2431986 (7th Cir.2009), at 13.  It is also clear that it does not matter whether a circuit has declared departures to be obsolete for a laxer, discretionary standard to apply in considering variances based on U.S.S.G. departure counterparts.  In *United States v. Chase*, 560 F.3d 828 (8th Cir.2009), the Eight Circuit, which is on the non-obsolete side of the divide, *United States v. Hawk Wing*, 433 F.3d 622, 631 (8th Cir.2006), took the opportunity to explain, when the government had cited on departure standard cases, that it felt "obligated by the Supreme Court's recent pronouncements on sentencing to iterate that the standards governing departures do not bind a district court when employing its discretion with respect to variances."  *Chase* at 832.  "We now clarify that departure precedent does not *bind* district courts with respect to variance decisions, it is merely persuasive."  *Id.* (emphasis in original).

A. Health and Age Factors

   As noted above, the standard for assessing the suitability of a variance based on health and age factors is not the same as for the age departure under §5H1.1 or the physical condition departure under §5H1.4.  *See*, for example, *United States v. Millet*, 510 F.3d 668, 680(7th Cir.2007)(although U.S.S.G. §5H1.4

provides that physical condition is not ordinarily relevant in the decision to depart downward from the guidelines unless the impairment is "extraordinary," a district court can consider physical impairments when exercising its discretion in accordance with §3553(a)). *Accord United States v. Harris*, 567 F.3d 846, 854-55 (7th Cir.2009).

Here, the PSR details DEFENDANT's ill health and the variety of medical conditions from which he suffers.  He is, as the court knows, sixty-nine-years-old.  The medical conditions need not be recited here.  DEFENDANT respectfully moves for a physical condition and age variance.

B. Substantial Assistance.

DEFENDANT's testimony was truthful and highly significant in the government's case against defendant Varner.  The government's three objections to DEFENDANT's testimony, on the grounds that his testimony was not truthful and thus undercut his credibility, are easily rebutted.  First, the government argues that DEFENDANT testified that he wanted to terminate the brokers bringing in the fraudulent loans in an effort to minimize his involvement in the fraud.  But this cannot be true, since DEFENDANT in nearly the same breath, after stating that he wanted to terminate what we can call the bad brokers, admitted that he knew that these brokers were bringing in fraudulent loans. (TR I at 132, line 6)[1].  This can hardly be considered the minimizing of guilt.  The government tries to bolster its claim by attacking DEFENDANT's

---

[1] The trial transcript for March 19, 2009, is described as "TR I" and the transcript for March 20, 2009, as "TR II".

reference to the fact that the brokers were Varner's friends. But DEFENDANT made clear that they were also his friends, at least in a business sense (TR II at 31, lines 21-24). And of course, the issue as to why DEFENDANT did not list the bad brokers in the letter (Ex. 28) relating to terminating brokers as a way of remedying problems at Mortgage One was made irrelevant by DEFENDANT's explanation that, by the time of the letter, it did not matter who was listed, since the end of the company was at hand. (Tr. II at 136, lines 7-11). Second, the government's claim regarding the quality control department turns on what it means to have such a department. DEFENDANT, as the government acknowledges, explained that Mortgage One did not have a quality control department in the HUD sense, that is, in the sense of having a department reviewing for quality purposes ten percent of the loans at Mortgage One. The only complication or tension here is that DEFENDANT testified that at one time Mortgage One had a quality control department run by his daughter. To the question of whether Mortgage One had a genuine quality control department, DEFENDANT answered yes, but in saying this he could only have meant that some people in the company were designated as quality control people, since he admitted in the same breath that it could not have been a legitimate, or genuine, department since the fraudulent loans were not submitted to it. In saying that Mortgage One had a quality control department for a time, he was merely saying that Mortgage One had a sham mortgage quality department for a time. A sham department, by definition, is not a real department. And third, the government incorrectly states that DEFENDANT had testified that he did not know of any

6

fraudulent loans at M—1 Capital or that defendant Varner similarly did not know of any such loans.  DEFENDANT testified, that M-1 Capital did not work out in practice as he had hoped, that is, that M-1 Capital was going to hire outside underwriters and that there would be no funny paper coming in. (TR I at 146, lines 6-9).  He testified as well that at least one of the brokers, Mauricio Duenas, brought in fraudulent loans. (TR I at 151 line 2).  He also testified on redirect examination that there were fraudulent loans at M-1 Capital (Tr. II 67, lines 3-5).  DEFENDANT hardly took the position that there were not fraudulent loans at M-1 Capital.  The government seems to be pointing to DEFENDANT's testimony in which he said that he did not believe that either he or defendant Varner "knew there was anybody doing – - we were saying bring the fraudulent loans to M-1 Capital." (TR II-67, lines 10-12).  But this is not an assertion that there were no bad loans at M-1 Capital. It is, instead, a reference to what had gone on at Mortgage One.  There the word was sent out far and wide that the brokers were to bring their bad loans to DEFENDANT and Varner.  And lastly, and to the extent that the government's statement is related to its argument, DEFENDANT explained, in the context of the computer program used for loan submission, that it could not be used for fraud by manipulating numbers because the inputted numbers would have to be reconciled with submitted documents. (TR I at 149-50, lines 4-9) Far from feigning ignorance as to the workings of the computer program to support a claim that he was oblivious to any fraud at M-1 Capital, DEFENDANT in his testimony was explaining how using the computer program did not facilitate the ease with

which fraud could be accomplished.

The government's argument for a reduction in the reward for DEFENDANT's substantial assistance fails by its own terms. The central claim is that DEFENDANT's credibility was affected by his supposed attempts to minimize his culpability in the fraud. But here, even if the bits of testimony were read as the government interprets them, DEFENDANT's credibility can hardly be said to be undermined, given that he repeatedly and without hesitation declared his involvement and responsibility for the fraud. Moreover, many of the government's complaints relate to what the government calls inconsistencies between DEFENDANT's testimony and what other witnesses had said when interviewed by investigators. First, that there are inconsistencies does not mean that DEFENDANT was lying. A far tougher test must be met. After all, those on the other side of the inconsistency are equally suspect. But more to the point, these so-called inconsistencies, even if they were true, were unknown to the jury. The government's essential point is that because of DEFENDANT's supposedly untruthful statements his credibility was undermined, but by definition this cannot be true if the finder of fact is unaware of the alleged inconsistency. The government, to be sure, points to nothing relating to the jury to suggest that DEFENDANT could have been more effective in his testimony. Given that he at every turn admitted his guilt and responsibility, any argument that he tried to minimize his guilt cannot take hold.

The government has not taken the tack of damning the DEFENDANT's substantial assistance with faint praise. Instead,

putting aside the complaints about what the government thinks about untruthfulness, the government, with one important exception, lists the number of ways that the DEFENDANT's testimony at trial helped its case and the number of ways that his cooperation prior to trial helped its case and prompted other co-defendants to plead guilty.  The surprise conclusion is that the substantial assistance for the government is worth only three levels.  Read by itself, an extremely high value would have to be placed on DEFENDANT's substantial assistance, this despite without even considering the government's omission in its recitation of DEFENDANT's assistance of an absolutely vital bit of testimony, the testimony regarding the use of non-CPA accountants as part of the scheme to persuade mortgage companies to do business with Mortgage One.  DEFENDANT  was able, because he was a member of an inner circle of two, to provide the inside information about how Mortgage One obtained the opportunity to engage in the mortgage fraud by sidestepping the CPA and auditing requirements. In the distinction between the means of the fraud and creating the opportunity for the fraud, DEFENDANT helped with the "but for" aspect of the opportunity to defraud.  As the government notes in its position paper, DEFENDANT also provided a wide variety of information regarding the means to the fraud that only he had.  It is thus odd to read of the government's attempt in its position paper to minimize DEFENDANT's substantial assistance on the means of the fraud, using phrases such as "some role," "while not essential," while at the same time reading that DEFENDANT's cooperation was "both significant and useful."  In the final analysis, DEFENDANT provided crucial testimony in a

trial in which the defendant was convicted on all counts by a jury returning its verdict in approximately two hours. It is difficult to see how DEFENDANT could have been more effective in his testimony. The government did not back away from DEFENDANT's testimony. Instead, it built upon it from beginning to end, from opportunity to means.

Given DEFENDANT's age and physical condition, his extraordinary substantial assistance, and the nearly two years he has been detained, DEFENDANT seeks a sentence of time served.

```
                                    RESPECTFULLY SUBMITTED,

                                    WILLIAM DOMNARSKI,
                                    ATTORNEY FOR
                                    RICHARD ELROY GIDDENS
```

DATED: August 24, 2009

__/s/_____
William Domnarski